NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

INTERNATIONAL ASSOCIATION OF
BRIDGE, STRUCTURAL AND REIN-
FORCED IRON WORKERS UNION,
LOCAL 378, AFL–CIO, Respondent.

No. 74–3226.

United States Court of Appeals,
Ninth Circuit.

March 16, 1976.

Elliott Moore, Deputy Associate Gen. Counsel., N.L.R.B. (argued), Washington, D.C., for petitioner.

Victor J. Van Bourg (argued), of Levy, Van Bourg & Hackler, San Francisco, Cal., for respondent.

## OPINION

Before BROWNING and SNEED, Circuit Judges, and SMITH,* District Judge.

RUSSELL E. SMITH, District Judge.

An enforced[1] order[2] required the Union to make one Castor whole for losses suffered by him as a result of Union discrimination resulting in his discharge by Judson

---

\* The Honorable Russell E. Smith, United States District Judge for the District of Montana, sitting by designation.

1. *NLRB v. International Ass'n of Bridge, Structural and Reinforced Iron Workers Union,*

*Local 378, AFL–CIO,* 473 F.2d 816 (9th Cir., judgment entered June 20, 1972).

2. 192 NLRB 1069 (1971).

Steel Corporation (Judson). By supplemental order, 213 NLRB 72 (1974), the Board established the backpay period as May 8, 1970, to July 25, 1972, and determined that there would have been paid to Castor during that period the sum of $12,292.00 in wages and to the pension trust on his behalf the sum of $1,986.00. The Board petitions for the enforcement of the supplemental order.

The amounts due were determined by use of the "representative employee" formula, which was approved by the court in *NLRB v. International Ass'n of Bridge, Structural and Ornamental Reinforced Iron Workers, Local 377* (9th Cir. No. 71–1824, judgment entered Aug. 15, 1974), enf'g 208 NLRB 135 (1974). This case is referred to as the "*Bettencourt* case." The method employed in *Bettencourt,* which the Board said was used in this case, was:

> . . . Analysis was made of the payroll records of all field ironworkers, excluding superintendents, foremen, apprentices, and employees with exceptionally high or low earnings, resulting in a group of 17 ironworkers, who were the only ones in the group of 26 (utilized in the *Bettencourt* case) who had worked in every quarter of Castor's backpay period. The average number of hours worked in each calendar quarter by this group was multiplied by the applicable hourly rates contained in the existing collective-bargaining agreement.
> TR p. 12 [3]

The Union claims that the representative employee method should not have been used and that, in any event, it was arbitrarily used under the facts. The enforcing order issued by this court required that back pay be computed in accordance with the method set forth in the remedy section of the trial examiner's decision which, in turn, referred to the methods approved by the Board in *F. W. Woolworth Co.,* 90 NLRB 289 (1950). Under the *F. W. Woolworth* formula, the first inquiry is—what would the employee have normally earned during the backpay period? In making this determination, the Board acts with broad discretion.

In *NLRB v. Carpenters Union, Local 180,* 433 F.2d 934 (9th Cir. 1970), it was said at 935:

> The Board is vested with broad discretion in selecting a backpay formula appropriate to the circumstances of a particular case. *N.L.R.B. v. Seven-Up Bottling Co.,* 344 U.S. 344, 346–348, 73 S.Ct. 287, 97 L.Ed. 377 (1953). Of necessity, the award in many instances may only be a close approximation. "In such circumstances the Board may use as close approximations as possible, and may adopt formulas reasonably designed to produce such approximations." *N.L.R.B. v. Brown & Root, Inc.,* 311 F.2d 447, 452 (8th Cir. 1963).

The question now before this court is whether the award was arbitrary or unrea-

---

**3.** The *Bettencourt* case involved the same employer and the same industry, but a different local union. In the *Bettencourt* case, an exhibit, Exhibit No. 4, which contained the names of 76 employees, was introduced. From the exhibit it was evident that some person, whose identity is not disclosed in this case, went through the list of 76 names and designated by symbols the apprentices, foremen, field superintendents, high foremen, non-ironworkers, men who did not work in all quarters during the backpay period, and men whose wages were too low to be used in the sample. These persons totaled 40 in number. There were then eliminated from the 36 remaining names the names of five men receiving the highest gross wages and the names of five men receiving the lowest gross wages, leaving 26 names. These 26 comprised the representative employee group in the *Bettencourt* case. Over objection, Exhibit No. 4 in the *Bettencourt* case was introduced as Exhibit No. 3 in this case. (It is hereafter referred to as Exhibit No. 3.) It was stipulated that the Judson pay records would show that the men named on Exhibit No. 3 did work at the times indicated and did receive the amounts shown, but nothing in the record, by stipulation or otherwise, indicates the relationship of the 76 named men to the total work force except the unsworn and hearsay statement of counsel, and there is no evidence that the symbols were correctly applied to the names that did appear. It was apparently assumed that Exhibit No. 3 had been fully authenticated in this case. It was not formally authenticated, and the record here does not circumstantially authenticate it.

sonable in the particular circumstances. *NLRB v. Ozark Hardwood Co.,* 282 F.2d 1 (8th Cir. 1960).

■ At the time of discharge, Castor had been employed by Judson as a journeyman ironworker for a total of about eight months. He had been transferred from a job at Stanford University, the place of his initial employment, to the BART job in San Francisco, where he was working at the time the Union brought about his discharge on May 8, 1972. Castor was relatively inexperienced, and at the very best only ordinarily skilled, but it may be inferred from the evidence that he would have been continued in his employment for some indefinite time except for the Union discrimination.

The record shows without dispute that Judson hired its ironworkers on a job-by-job basis, employing and discharging according to its labor requirements on each job and without regard to seniority. On the BART job the ironworker employment was:

| | |
|---|---|
| May 10, 1970 (Castor's last day) | 32 |
| May 17–30 | 17–19 |
| June | 15–21 |
| July | 17–26 |
| August | 2–22 |
| September | 7–12 |
| October | 3–13 |
| November | 2– 8 |
| December 1–13 | 3– 8 |
| December 14 (job complete) | 0 |

The record does not show what other jobs Judson had going in the backpay period of May, 1970, to July 25, 1972, but it does show that during the period the employment of ironworkers ranged from a low of about 25 to a high of in excess of 150. The men most steadily employed were the foremen.

The representative employees formula was employed here by taking the list of 26 men found to be representative in *Bettencourt* and eliminating from it nine men who ·

were not employed in each quarter between the end of the *Bettencourt* backpay period and the end of the backpay period here. The 17 remaining were used as the representative employee group. It should be noted that the *Bettencourt* list of 26 had resulted from an elimination of nine [4] of the lowest-paid employees and only five of the highest-paid, and it should be further noted that, although the *Bettencourt* list of 26 was supposed to be exclusive of foremen, the list of 17 here (selected from the 26) did, according to the.evidence here, contain the names of five foremen.

The 17 men chosen as representative were, therefore, not only the ones who had worked in each quarter over a period of more than 25 months, but also were those who had been employed sufficiently in each quarter so as to escape the classification "wages too low to be used in sample." These 17 were part of a group of 22 [5] men who were the most steadily employed journeymen ironworkers out of all of the 150 who worked during the period. In view of the fact that the employment of ironworkers dropped during the period to a low of 25, including foremen, it is our opinion that the group of 17 was simply not representative of the ordinary ironworker, such as Castor. He was at best but an average ironworker. To treat him as one of the elite group of the most steadily employed was arbitrary.

■ We do not intimate that the Board may not select the formula which it believes will best reflect the amount of back pay which would have been earned, nor that the formula must be employed with a mathematical exactitude, nor that the representative employee group formula may not be employed in the construction industry. We go no further than to say that, first, where the question is "what did Castor lose by reason of the discrimination?" the representative employee formula may not be em-

---

**4.** Four employees were eliminated because their wages were too low to form a part of the sample before the elimination of the five highest-paid and the elimination of the five lowest-paid.

**5.** Included in the 22 are the five who, for the purpose of reaching the *Bettencourt* representative group of 26, were eliminated because they had the highest earnings.

ployed unless it is representative of Castor and, second, that in an industry where employment is intermittent,[6] the fact of intermittency must be taken into account in some measure unless there is something in the record which justifies a finding that, for some reason, the employee involved would not have been affected by the fluctuations that affected the group as a whole.[7]

The case is remanded to the Board for further proceedings not inconsistent herewith.

BROWNING, Circuit Judge, would hold that the Board's Order is supported by substantial evidence in the record, and would enforce it.

---

**6.** There was a finding in *Bettencourt* that Judson had a permanent work force of 100. That finding could not be made on the record here.

**7.** There was evidence in *Bettencourt,* accepted by the administrative law judge and the Board, that Bettencourt was one of the best ironworkers that the general superintendent of Judson had ever seen.